## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In the Matter of:

                                              Case No. HK 09-00358

CHECKER MOTORS CORPORATION,
a Delaware corporation,

        Debtor.
_____/

THOMAS C. RICHARDSON, LIQUIDATING
TRUSTEE OF CHECKER MOTORS CORPORATION,
as successor in interest to the OFFICIAL
COMMITTEE OF UNSECURED CREDITORS OF
CHECKER MOTORS CORPORATION,

        Plaintiff,

                                              Adv. Pro. No. 11-80015

-vs-

CHECKER ACQUISITION CORPORATION,

        Defendant.
_____/

THOMAS C. RICHARDSON, LIQUIDATING
TRUSTEE OF CHECKER MOTORS CORPORATION,
as successor in interest to the OFFICIAL
COMMITTEE OF UNSECURED CREDITORS OF
CHECKER MOTORS CORPORATION,

        Plaintiff,

                                              Adv. Pro. No. 11-80016

-vs-

ALLAN R. TESSLER,

        Defendant.
_____/

**[CAPTIONS CONTINUED ON NEXT PAGE]**

THOMAS C. RICHARDSON, LIQUIDATING
TRUSTEE OF CHECKER MOTORS CORPORATION,
as successor in interest to the OFFICIAL
COMMITTEE OF UNSECURED CREDITORS OF
CHECKER MOTORS CORPORATION,

       Plaintiff,

                                 Adv. Pro. No. 11-80018

-vs-

CHRISTOPHER MARKIN,

       Defendant.
_____/

THOMAS C. RICHARDSON, LIQUIDATING
TRUSTEE OF CHECKER MOTORS CORPORATION,
as successor in interest to the OFFICIAL
COMMITTEE OF UNSECURED CREDITORS OF
CHECKER MOTORS CORPORATION,

       Plaintiff,

                                 Adv. Pro. No. 11-80019

-vs-

DAVID MARKIN,

       Defendant.
_____/

## OPINION RE: TRUSTEE'S DECEMBER 7, 2012 MOTION - PARTIAL SUMMARY JUDGMENT

      Thomas C. Richardson, the liquidating trustee in this Chapter 11 case ("Trustee"),[1] has

commenced these four adversary proceedings to recover fraudulent transfers allegedly made by

_____

      [1]Debtor filed for Chapter 11 relief on January 16, 2009 and then confirmed its plan of liquidation on March 31, 2011. Trustee is authorized under the terms of the confirmed plan to pursue avoidance actions arising under Chapter 5 of the Bankruptcy Code. Checker Motors Corp. Chapter 11 Plan of Reorganization, *In re Checker Motors Corp.*, No. 09-00358, 11 (Bankr. W.D. Mich. Jan. 16, 2009) (DN 545).

Debtor to the Defendants.[2]  Among other things, Trustee contends that Debtor was insolvent when each of the challenged transfers was made.  The question the court addresses here is whether the withdrawal liability Debtor potentially faced with respect to its participation in a multiemployer retirement plan should be included or not in that calculation.[3]

## BACKGROUND[4]

Trustee seeks to avoid under either Section 548 or Section 544(b)[5] transfers Debtor made as far back as January 2005.  Although Trustee has posited a number of different reasons for avoidance,

---

[2]The issue addressed in this opinion is common to all four adversary proceedings and has been consolidated for purposes of adjudication.  *See, e.g.,* July 2, 2012 Second Pretrial Order, Bifurcation / Consolidation of Issues 5 (DN 47), *Richardson v. Checker Acquisition Corp.*, A.P. No. 11-80015 (Bankr. W.D. Mich. Jan. 14, 2011) (hereinafter referred to as the "July 2, 2012 Pretrial Order").

[3]Defendants themselves had first identified this issue as something they would raise in connection with excluding proofs for trial.  Trustee, though, preempted Defendants by bringing his own motion.  For the reasons stated at the December 27, 2012 status conference, the court has elected to adjudicate Trustee's motion as one for partial summary judgment.  *Cf. Accu-Tech Corp. v. Jackson*, 352 F. Supp.2d 831, 833-34 (E.D. Mich. 2005).

[4]The record consists of the parties' briefs and their arguments made at the February 21, 2013 hearing.  The court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(1) and W.D. Mich. LCivR 83.2.  This is also a core proceeding.  28 U.S.C. § 157(b)(2)(H).  However, this court need not at this time make any determination regarding its constitutional authority to enter a final order since the relief requested is interlocutory.  Moreover, it appears that the District Court will ultimately be charged with entering a final order in any event given that Defendants have demanded a jury trial.

As for the applicable standard of review, summary judgment is appropriate if there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law.  FED. R. BANKR. P. 7056 and FED. R. CIV. P. 56(a).  And in applying that standard, the court is to focus only upon material facts; that is, the court is to consider only those facts that are important vis-a-vis the applicable substantive law.  However, in determining whether there is a genuine dispute, the court is also to draw all inferences from the record before it in the light most favorable to the non-moving party.  If, though, that party could not prevail before a rational trier of fact under even these circumstances, summary judgment must be granted.

[5]11 U.S.C. §§ 548 and 544(b).  The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532. Unless otherwise noted, all further statutory references are to the Bankruptcy Code.

a primary one is based upon Debtor's alleged insolvency at the time of the transfers and the lack of consideration Defendants gave in exchange. In particular, Section 548 avoids transfers by insolvent debtors if the debtor had received less than "reasonably equivalent value" in return[6] and Section 544(b) incorporates Michigan's version of the Uniform Fraudulent Transfer Act ("MUFTA")[7] and its prohibition of transfers made for inadequate value whenever the debtor is insolvent.[8] Transfers like these are often described as being "constructively fraudulent" on the debtor's part.

As for how the debtor's insolvency is to be determined, both Section 548 and MUFTA compare the fair value of the debtor's assets with the sum of its debts.[9] This approach equates roughly to a debtor's balance sheet, since that too represents a comparison of an entity's assets with its liabilities at a particular point in time. However, balance sheets seldom include assets at their fair value.[10] Likewise, a balance sheet might not include all of the liabilities that otherwise would be considered for purposes of assessing insolvency when a fraudulent transfer is alleged.

Indeed, the specific issue posed by Trustee's motion here is whether a liability that is seldom, if ever, included on a debtor's balance sheet – i.e., the liability associated with withdrawing from a multiemployer retirement plan – should nonetheless be included in assessing whether any of the

---

[6]11 U.S.C. § 548(a)(1)(B)(i) and (ii)(I).

[7]MICH. COMP. LAWS §§ 566.31-566.43.

[8]MICH. COMP. LAWS § 566.35.

[9]11 U.S.C. § 101(32)(A) and MICH. COMP. LAWS § 566.32(1).

[10]Generally accepted accounting principles ("GAAP") govern audited financial statements and one of those principles is that the statements should reflect a conservative view of the entity's financial condition. Therefore, an audited statement of financial position (i.e., a balance sheet) may include a non-cash asset at its fair value only in those rare instances where that value is less than the asset's depreciated cost.

4

challenged transfers should be avoided or not. In raising this issue, Trustee has been careful not to ask for an actual determination of what that liability might have been. As Trustee concedes, that is a question of fact for the jury.[11] Nonetheless, it is clear from the documents provided that the inclusion or not of this amount will significantly tip the scales one way or the other. For example, Debtor's audited financial statements for calendar year 2005 show a net equity of about $6 million. Those statements, though, did not include the $12.6 million in withdrawal liability that was being estimated at that time. Indeed, that estimate had grown to more than $44 million by July of 2008.

## DISCUSSION

Withdrawal Liability

Debtor was a member of a multiemployer pension plan during the entire period relevant to these adversary proceedings and Debtor in fact continued to be a member postpetition until June of 2009. As the name suggests, multiemployer plans are distinguished from single employer plans by the number of employers who contribute to a particular pension plan. Multiemployer plans are often associated with industries where there may be many employers but only one or two unions representing the workers.

> Multiemployer plans are generally found in the trucking, apparel, coal mining, construction, entertainment, food and baked goods, communication, and public utilities industries. Examples include plans that involve various employers having collective bargaining agreements with locals of the United Mine Workers or Amalgamated Clothing and Textile Workers or the International Typographical Union.[12]

---

[11]Trustee agrees that Defendants are entitled to a jury trial with respect to the avoidance/recovery actions Trustee has brought against them. *See, e.g.*, July 2, 2012 Pretrial Order.

[12]Barbara J. Coleman, Primer on Employee Retirement Income Security Act 82 (4th ed. 1993).

Prior to ERISA,[13] companies were not accountable to retirement plans for promised benefits should, for example, a company go out of business without having adequately funded the plan.[14] However, ERISA remedied that problem, at least in part, by both creating the Pension Benefit Guaranty Corporation ("PBGC") and tightening the funding requirements for tax qualified plans.[15]

The PBGC offers an insurance program for plan beneficiaries in the event an underfunded plan is terminated. For instance, the PBGC will pay from its own reserves at least a portion of those unfunded benefits. And, like an insurer, the PBGC will then have its own right to recover against the terminating employer.[16]

However, multiemployer plans posed a problem from the outset of ERISA because that type of plan was typically not dependent upon the participation of any single employer. Indeed, how and when a particular employer participated in a multiemployer plan depended in large part upon whatever terms were struck with that employer's local union. Consequently, it was possible for an employer to withdraw from a multiemployer plan without the plan itself terminating.

The question raised was whether the PBGC should also insure the beneficiaries of a multiemployer plan should that type of plan ever terminate. By way of background, the federal government does not fund the PBGC. Rather, it is a separate entity that provides for its

---

[13]Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829 (codified as amended in scattered sections of 5 U.S.C., 18 U.S.C., 26 U.S.C., 29 U.S.C., and 42 U.S.C.).

[14]Coleman, *supra* at 69.

[15]The Multiemployer Pension Plan Amendments Act of 1979, H.R. Rep. No. 96-869 Part I, 96th Cong. 2nd Sess., at 1 (1980), *reprinted in* 1980 U.S.C.C.A.N. 2918.

[16]Coleman, *supra* at 69-81.

6

capitalization in large part through the premiums it assesses against the covered plans.[17] In other words, the PBGC is to be self-supporting, at least in theory. The concern, then, was whether the PBGC could sustain itself if it also took on the risk of multiemployer plan terminations.

Congress initially left that decision to the PBGC, with the PBGC opting to exclude multiemployer plans from its coverage. However, as time passed, it became apparent that more and more multiemployer plans were seriously underfunded. In particular, plans associated with declining industries were suffering because the shrinking employee base could no longer support an often growing number of retirees entitled to fixed benefits.

Moreover, the problem was exacerbated by the ability of employers to withdraw from a multiemployer plan with relatively little exposure. Under ERISA as originally enacted, an employer who withdrew had no accountability for unfunded benefits for its employees under that plan provided that the plan did not terminate within five years. Consequently, employers contributing to a multiemployer plan in a declining industry or a plan that was otherwise at risk were motivated to withdraw while, if you will, the "getting was good." Early withdrawals, though, only added to the problem by leaving the remaining employers with the burden of contributing even more in order to keep the plan afloat.

As the House Committee on Education & Labor itself observed:

> The capacity of a multiemployer plan to meet its benefit commitments depends on the maintenance of a stable or growing contribution base. Discrete instances of withdrawal will not affect the soundness of a plan if the withdrawn employer is replaced by newly entering contributors or expansion of covered employment with other contributing employers. If employer withdrawals are accompanied by a decline in the industry, trade, or craft covered by the plan, however,

---

[17]*Id.* at 69.

7

the resulting funding burden on remaining contributors and active employees may be intolerably high. In highly competitive or marginal industries, such increased costs may make the plan unattractive so that new employers are discouraged from coming into the plan. The solvency of the plan is then threatened, particularly where benefit improvements have been funded over unrealistically long periods of time.[18]

Indeed, it was the threat posed by the termination of these increasingly distressed multiemployer plans that had kept Congress from requiring the PBGC to insure such plans when ERISA was first enacted. However, Congress ultimately decided that terminated multiemployer plans had to be covered as well, with that mandatory coverage becoming effective in May of 1980. But that decision also put at risk the solvency of the PBGC. Put simply, unless something was done the PBGC would not be able to survive the expected onslaught of terminated multiemployer plans in declining industries.

Congress responded by also enacting in 1980 the Multiemployer Pension Plan Amendments Act.[19] Although that act incorporated a number of different steps to solve the problem, the important one for purposes here was the imposition of liability upon any employer who chose to withdraw from an underfunded multiemployer plan. Again, the law until then permitted an employer to withdraw without any financial repercussions so long as the plan was not terminated within five years of the withdrawal. However, the 1980 amendment changed that by making the withdrawing employer immediately "responsible for a prorated share of the plan's total unfunded liabilities based on either

---

[18]H.R. Rep. No. 96-869 Part I at 53-54, 1980 U.S.C.C.A.N. at 2921-22.

[19]Pub. L. No. 96-364, 94 Stat. 1208 (codified as amended in scattered sections of 29 U.S.C., 26 U.S.C, and 5 U.S.C.).

the number of years they were in the plan relative to other employers or the length of service of their employees relative to the employees of other employers."[20]

In sum, then, it is this withdrawal liability that the 1980 amendment imposed that is the focus of Trustee's motion here. Trustee concedes that Debtor never in fact withdrew from the plan until after Debtor had commenced its case. Nonetheless, Trustee contends that the possibility always existed prepetition that Debtor might withdraw and that, as a consequence, Debtor's exposure associated with that withdrawal should be included in determining whether Debtor was insolvent at any of the times the challenged transfers were made.

Insolvency and Fraudulent Transfers

Bankruptcy law has always looked disfavorably upon liars and cheats. For example, a debtor who conceals property from creditors before filing for bankruptcy relief or who intentionally deceives the trustee after filing will not be discharged of his debts.[21] And similarly, the recipient of fraudulently transferred property must give it back to the estate regardless of the consideration paid if he was a knowing participant in the debtor's fraud.[22]

The law traditionally described deceit like this as *malum per se* – i.e., it is conduct that is inherently wrong.[23] In contrast, many other laws are just *malum prohibitum*, which means that it is

---

[20]Coleman, *supra* at 85.

[21]*Cf.* 11 U.S.C. §§ 727(a)(2) and (4)(A).

[22]*Meoli v. Huntington Nat'l Bank (In re Teleservices Group, Inc.)*, 444 B.R. 767, 795-813 (Bankr. W.D. Mich. 2011).

[23]Black's Law Dictionary does not define *malum per se*. It does, though, define *malum in se*:

9

only the proscription itself that renders the conduct unlawful. For example, murder, rape, and theft are all considered as wrong under Anglo-American jurisprudence regardless of whether any governmental authority has deemed them a crime whereas driving without a license or failing to file a tax return is wrong only because a statute or regulation has made it so. Indeed, the Supreme Court acknowledged this difference years ago when it distinguished actually fraudulent transfers from transfers that were merely preferential.

> The statute recognizes the difference between the intent to defraud and the intent to prefer, and also the difference between a fraudulent and a preferential conveyance. One is inherently and always vicious; the other innocent and valid, except when made in violation of the express provisions of a statute. One is *malum per se* and the other *malum prohibitum*,-and then only to the extent that it is forbidden. A fraudulent conveyance is void regardless of its date; a preference is valid unless made within the prohibited period. It is therefore not in itself unlawful to prefer, nor fraudulent for one, though insolvent, to borrow in order to use the money in making a preference.

*Van Iderstine v. Nat'l Disc. Co.*, 227 U.S. 575, 582, 33 S. Ct. 343, 345 (1913).[24]

---

> A wrong in itself; an act or case involving illegality from the very nature of the transaction, upon principles of natural, moral, and public law.

*Id.* at 959 (6th ed. 1990).

[24]The difference between *malum per se* (or *in se*) and *malum prohibitum* is also illustrated in this exchange between Mattie, Rooster, and an inebriated LaBoeuf in the Coen brothers' version of TRUE GRIT:

> LABOEUF
> Azh I understand it, Chaney--or Chelmzhford, azh he called himself in Texas--shot the shenator'zh dog. When the shenator remonshtrated Chelmzhford shot him azh well. You could argue that the shooting of the dog wazh merely an inshtansh of *malum prohibitum*, but the shooting of a shenator izh indubitably an inshtansh of *malum in shay.*

10

And the same can be said for the difference between actually fraudulent transfers and those that are only constructively fraudulent. For example, it is seldom the case where a debtor will openly admit to having defrauded his creditors. Therefore, the law has over time accumulated a number of so-called "badges" as circumstantial evidence of the debtor's intended fraud. In fact, state statutes that address fraudulent transfers have themselves incorporated these badges for determining actual intent. For example, MUFTA directs that a court, in assessing actual intent, may consider a number of very specific factors, including the value of the consideration exchanged and the solvency of the debtor.[25]

However, as already noted, actual intent need not be established under either MUFTA or Section 548 in order for the transfer to be avoided as fraudulent. Rather, each permits avoidance regardless of actual intent when only insolvency and the absence of reasonably equivalent value can be established.[26] And again, avoidable transfers like these are deemed to be constructively fraudulent so as to distinguish them from those where the debtor's intent to defraud his creditors was actual.

---

ROOSTER
Malla-men what?

MATTIE
*Malum in se.* The distinction is between an act that is wrong in itself, and an act that is wrong only according to our laws and mores. It is Latin.

(Paramount Pictures 2010).

[25]MICH. COMP. LAWS § 566.34(2). Among the other factors that may be considered are (1) whether the transferee was an insider, (2) whether the transfer had been concealed, and (3) whether the debtor was being threatened by litigation. *Id.*

[26]11 U.S.C. § 548(a)(1)(B); MICH. COMP. LAWS § 566.34(1)(b).

11

Interestingly, constructively fraudulent transfers share many of the same attributes as preferences. Neither is based upon actual intent. The focus is instead upon only the debtor's insolvency and the value exchanged. Indeed, all that really distinguishes the two is the nature of that value. Whereas satisfaction of an antecedent debt is sufficient when constructive fraud is alleged,[27] more in the way of value is required when the challenged transfer falls within the preference period as well.[28]

That there is this similarity, though, should not be too surprising given that constructively fraudulent transfers, like preferences, are only *malum prohibitum*. In fact, each in its own way serves the same legislative purpose – i.e., to ensure that a fair distribution is made through the bankruptcy process.[29] Consider, for example, a bankrupt debtor with two creditors but only $1,000 to his name.

---

[27]11 U.S.C. § 548(d)(2)(A); MICH. COMP. LAWS § 566.33(1).

[28]*See, e.g.*, 11 U.S.C. §§ 547(c)(1) and (4). *See also Meoli v. The Huntington Nat'l Bank (In re Teleservices Group, Inc.)*, 444 B.R. 767 (Bankr. W.D. Mich. 2011).

[29]      [Preference avoidance] is designed "to accomplish proportionate distribution of the debtor's assets among its creditors, and therefore to prevent a transfer to one creditor that would diminish the estate of the debtor that otherwise would be available for distribution to all."

*Triad Int'l Maint. Corp. v. S. Air Transp., Inc. (In re S. Air Transp., Inc.)*, 511 F.3d 526, 530 (6th Cir. 2007) (citations omitted).

And *Collier* has likewise said:

Although the origins of fraudulent transfer law are in transactions entered into with actual intent to defraud, the majority of reported cases focus on another branch of fraudulent transfers—transactions which the law deems constructively fraudulent; that is, transactions that may be free of actual fraud, but which are deemed to diminish unfairly a debtor's assets in derogation of creditors. That type of transaction is the subject of section 548(a)(1)(B).

12

Ideally, a trustee would take that $1,000 and distribute it equally between the two creditors. However, that could not happen if, before filing, the debtor had preferred one of his creditors over the other or, in the alternative, given the $1,000 to his favorite nephew. Therefore, Congress has, as a matter of policy, incorporated into the bankruptcy laws both preference and constructive fraud actions as means to rectify these inequities even when there has been no actual fraudulent intent on the debtor's part[30] Or, as the Supreme Court itself has said:

> In a preferential transfer the fraud is constructive or technical, consisting in the infraction of that rule of equal distribution among all creditors which it is the policy of the law to enforce when all cannot be fully paid. In a fraudulent transfer the fraud is actual,–the bankrupt has secured an advantage for himself out of what in law should belong to his creditors, and not to him.[31]

In sum, then, avoiding the transfers in this instance as constructively fraudulent is not a matter of righting a wrong, at least in the moral sense. Rather, Trustee's effort here under both Sections 548 and 544(b) reflects a policy of ensuring a fair distribution among creditors when a bankruptcy case is being administered. And key to the implementation of this policy is the question of insolvency. In other words, Congress will allow a debtor to make prepetition gifts to his nephews and nieces so long as there is no actual intent to defraud his creditors and the debtor otherwise still has enough assets to repay all that he owes. On the other hand, gifts made when the debtor is insolvent are avoidable regardless of actual intent simply because they would skew what Congress has otherwise determined should be a fair distribution of the debtor's assets among his creditors.

---

5 *Collier on Bankruptcy* ¶ 548.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013). *See also Melamed v. Lake Cnty. Nat'l Bank*, 727 F.2d 1399, 1402 (6th Cir. 1984).

[30]*Cf. Coder v. Arts*, 213 U.S. 223, 241, 29 S. Ct. 436, 443 (1909).

[31]*Id.* (quoting from *In re Maher*, 144 F. 503, 509 (D. Mass. 1906)).

13

*CPT Holdings*

As already indicated, the issue Trustee raises is whether the withdrawal liability associated with a debtor's participation in a multiemployer plan should be included in deciding whether a constructively fraudulent transfer has been made. However, before that question can be answered, the Sixth Circuit's decision in *CPT Holdings* must be discussed.[32]

*CPT Holdings* did not involve an avoidance action. Rather, it addressed the much different question of whether a debtor's withdrawal liability was discharged as part of a confirmed Chapter 11 plan even though the debtor's actual withdrawal from the plan had not occurred until later. The debtor, Hupp Industries, Inc. ("Hupp"),[33] filed for bankruptcy relief in 1991 and then continued to operate postconfirmation with the assistance of CPT Holdings ("CPT") until it was ultimately liquidated in 1994. Hupp had been a member of a multiemployer pension plan both before and after the Chapter 11 proceeding. However, CPT had become a member only after Hupp's plan was confirmed. Therefore, when Hupp's liquidation also precipitated its withdrawal from the pension plan, a dispute arose between CPT and the plan as to whether CPT could be assessed for all of Hupp's withdrawal liability, with CPT taking the position that Hupp's preconfirmation liability had been discharged as part of the Chapter 11 confirmation process.[34] An arbitrator had earlier decided

---

[32]*CPT Holdings, Inc. v. Indus. & Allied Employees Union Pension Plan, Local 73*, 162 F.3d. 405 (6th Cir. 1998).

[33]*CPT Holdings* refers to the debtor only as "Hupp." However, an internet search suggests that the debtor was in fact a bankrupt Cleveland company known as Hupp Industries, Inc.

[34]As already mentioned, CPT did not become associated with the multiemployer plan until after confirmation. However, ERISA required CPT to be "grouped" with Hupp thereby making CPT jointly and severally liable for whatever Hupp's withdrawal liability might be postconfirmation. Therefore, it was in CPT's interest to argue that Hupp's own preconfirmation withdrawal liability had been discharged at confirmation. 162 F.3d at 407.

14

that CPT was liable for the entire amount. The district court, though, disagreed, holding instead that CPT's exposure was limited to only its own postconfirmation participation.

In reversing the district court, the Sixth Circuit had to address what was meant by Section 1141(d)(1) in the context of Hupp's potential withdrawal liability. That section states in pertinent part that "the confirmation of a plan . . . discharges the debtor from **any debt** that arose before the date of such confirmation" (emphasis added). And, "debt," in turn, is defined in Section 101(10) as any "liability on a claim," with "claim" then being defined as including any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ."[35]

While CPT agreed that the plan's right to actually demand payment on account of Hupp's withdrawal had not arisen until after the plan was confirmed, CPT argued that the mere possibility of that liability becoming a reality was sufficient for it to still be treated as a preconfirmation claim for purposes of the Section 1141(d)(1) discharge. CPT also relied upon both the Supreme Court and legislative history for the proposition that a claim, for purposes of the bankruptcy process, should be read broadly to include everything that would amount to an enforceable obligation.[36]

However, the Sixth Circuit was not persuaded, holding instead that:

> [w]ithdrawal liability is not a "claim" prior to confirmation. Although the Bankruptcy Code defines "claim" broadly, the relevant non-bankruptcy law must be examined to see whether a right to payment, even a contingent right, exists. It is possible that an employer could fail to make every required contribution to a

---

[35]11 U.S.C. § 101(5).

[36]*See, e.g., Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S. Ct. 1212, 1216 (1998) ("a 'right to payment' . . . is nothing more nor less than an enforceable obligation.") (quoting from *Pa. Dept. of Pub. Welfare v. Davenport*, 495 U.S. 552, 559, 110 S. Ct. 2126, 2131 (1990)).

multiemployer pension plan, eventually withdraw from the plan, and still be assessed no withdrawal liability. Withdrawal liability is based on an employer's share of unfunded vested benefits at withdrawal, not on failure to make required contributions. As a result, there can be no pre-withdrawal breach of ERISA giving rise to a "right to payment" by a plan. Upon the facts at issue, a "claim" cannot exist prior to withdrawal.[37]

## Section 548 Constructive Fraud and Withdrawal Liability

Defendants cite *CPT Holdings* because the Bankruptcy Code's definition of insolvency includes only those liabilities that are "claims."[38] Therefore, they argue that Debtor's potential withdrawal liability at any given time prepetition is no more a claim for purposes of assessing its insolvency than was Hupp's potential withdrawal liability a preconfirmation claim for purposes of Section 1141(d)(1). Indeed, Defendants contend that this court has no choice but to follow *CPT Holdings* because, as the Bankruptcy Appellate Panel found in *HNRC Dissolution, Co*, it is binding precedent.[39]

Trustee, though, argues that *CPT Holdings* is distinguishable because it is based upon "a very narrow set of facts, which are not present here."[40] Indeed, Trustee asserts that *CPT Holdings*, in

---

[37]162 F.3d at 409.

[38]*See* 11 U.S.C. §§ 101(5), (10), and (32).

[39]*United Mine Workers of Am. 1974 Plan and Trust v. Lexington Coal Co., LLC (In re HNRC Dissolution Co.)*, 396 B.R. 461, 473-74 (B.A.P. 6th Cir. 2008). The question in *HNRC Dissolution* was whether the plan's substantial withdrawal liability claim should be treated as an administrative expense or not. Although most of the opinion focused on whether there had been any benefit to the estate, the BAP determined first that the plan's claim arose postpetition because the debtor had not withdrawn from the plan until well after the case had been commenced.

[40]Pl. Br. in Supp. of Mot. at 12.

stating that *Art Shirt*[41] involved "different facts,"[42] implicitly adopted *Art Shirt's* earlier conclusion that withdrawal liability is to be included in determining a debtor's insolvency.

However, it is *CPT Holdings'* interpretation of the law, not the facts, that makes it a problem for Trustee. This court agrees that the Sixth Circuit might have reached the same conclusion as did the court in *Art Shirt* had the question at that time been about the inclusion of the debtor's withdrawal liability in determining either Section 547 or Section 548 insolvency. However, the issue in *CPT Holdings* was instead whether that same contingent withdrawal liability should be subject to the Section 1141(d)(1) discharge. Hindsight, of course, suggests that Congress should have defined "claim" differently for each situation or perhaps even selected another word altogether in order to differentiate the two. Unfortunately for Trustee, Congress chose instead to use the same word and, more importantly, the same statutory definition, to cover both. As such, this court is compelled to follow *CPT Holdings* notwithstanding its own suggestion that Section 547 and 548 insolvency involves "different facts."[43] Indeed, to conclude otherwise would conflict with the well established rule of construction that identical terms within a statute should have the same meaning.[44]

Therefore, this court concludes (1) that insolvency for purposes of Section 548(a)(1)(B)(ii)(I) permits only claims as defined by Section 101(5) to be included in that calculation; and (2) that a debtor's withdrawal liability from a multiemployer plan does not become a "claim" within the

---

[41]*Fryman v. Century Factors (In re Art Shirt Ltd., Inc.)*, 93 B.R. 333 (Bankr. E.D. Pa. 1988).

[42]*Cf. CPT Holdings*, 162 F.3d at 408.

[43]*Id.*

[44]*See, e.g., Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479, 112 S. Ct. 2589, 2596 (1992); *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S. Ct. 2499, 2504 (1990); *Sorenson v. Sec'y of Treasury of the U.S.*, 475 U.S. 851, 860, 106 S. Ct. 1600, 1606 (1986).

meaning of Section 101(5) until the debtor has actually withdrawn from the plan.[45]  As a result, Trustee here cannot rely upon Debtor's potential withdrawal liability to establish constructive fraud under Section 548(a)(1)(B) given his concession that Debtor had not withdrawn from the multiemployer plan prior to the commencement of its case.

Section 544(b) Constructive Fraud

Trustee, though, has not relied upon only Section 548 to avoid these transfers as fraudulent, for he has also pled Section 544(b) in the alternative.  That section provides in pertinent part that:

> [T]he trustee may avoid any transfer of an interest of the debtor in property . . . by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.[46]

As to what that applicable law may be, the parties agree that it is MUFTA.[47]

MUFTA and Section 548 are similar because both are derived from the Uniform Fraudulent Transfer Act.[48]  For example, MICH. COMP. LAWS § 566.32(1), much like Section 101(32), measures solvency by comparing the debtor's liabilities with the debtor's assets at a fair valuation.  And, in turn, debt under MUFTA is defined as "liability on a claim" with claim then being any "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[49]

---

[45]*Cf. CPT Holdings*, 162 F.3d at 409.

[46]11 U.S.C. § 544(b)(1).

[47]MICH. COMP. LAWS §§ 566.31-566.43.

[48]5 *Collier on Bankruptcy* ¶ 548.01[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013).

[49]MICH. COMP. LAWS §§ 566.31(c) and (e).

18

Nor is it remarkable that Defendants rely upon these similarities to assert that *CPT Holdings* should also dictate when a debtor's withdrawal liability is to be included under MUFTA. However, Defendants' argument is not convincing.

Consider, for instance, *Xonics Photochemical*,[50] which Defendants contend is controlling. In *Xonics*, the debtor's guaranty of another's debt became an issue when the now debtor-in-possession attempted to avoid some prepetition transfers as preferences. Defendants cite *Xonics* because of the questions Judge Posner raised regarding the inclusion of contingent debt like a guaranty in the calculation of Section 547(b)(3) insolvency.

> The startling feature of the case is the parties' apparent assent to the proposition that if the loan guarantee and the note that Xonics Photochemical had co-signed were valid obligations, Xonics Photochemical was insolvent as of the date the obligations were assumed, on the theory that they created liabilities greater than the company's net assets . . . . **The proposition is absurd; it would mean that every individual or firm that had contingent liabilities greater than his or its net assets was insolvent-something no one believes**. Every firm that is being sued or that may be sued, every individual who has signed an accommodation note, every bank that has issued a letter of credit, has a contingent liability. Such liabilities are occasionally listed on the firm's balance sheet, for example by earmarking a portion of surplus for contingent liabilities. (They are supposed to be listed "if the future event is *likely to occur* and if its amount can be *reasonably estimated*.") More often they are listed in a footnote, thus leaving the firm's stated net worth undisturbed. Often they are not listed at all, when they are remote or when they are too small to affect net worth substantially.[51]

---

[50]*In re Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir. 1988).

[51]*Id.* at 199-200 (emphasis added) (citations omitted).

All of this is certainly true. Therefore, when the court in *Martin*,[52] another case cited by Defendants, found that it was "highly unlikely"[53] that creditors holding guaranties against the debtor would ever demand payment on the same, it is understandable that that court chose to exclude those same guaranties from its consideration of whether the debtor was insolvent under Illinois' fraudulent transfer laws.[54]

But *Xonics* also recognized as equally untenable what Defendants are proposing here – that contingent or inchoate claims of the bankrupt are never to be included in determining a debtor's insolvency.[55] *Xonics* said instead that it was for the court in each case to decide whether a contingent liability's "present, or expected, value" is to be face, zero, or somewhere in between.[56]

Again, Defendants assert that no amount should be ascribed to Debtor's withdrawal liability because the contingency upon which it is premised – the cessation of Debtor's business – did not occur until well after the challenged transfers had been made. However, what Defendants ignore is that the cessation of a debtor's business is implicitly assumed whenever a transfer is challenged as being constructively fraudulent. Remember, it is policy, not morality, that dictates whether a particular transfer is to be deemed constructively fraudulent or not. And, again, that policy is to ensure a fair distribution of the debtor's assets upon its liquidation. As such, it necessarily follows

---

[52]*Bay State Milling Co. v. Martin*, 145 B.R. 933 (Bankr. N.D. Ill. 1992).

[53]*Id.* at 949.

[54]Indeed, the court in *Martin* specifically said that "contingent liabilities **will be counted** if there is a likelihood that the contingency will occur." *Id.* (emphasis added).

[55]*Xonics*, 841 F.2d at 200 (quoting *Allegaert v. Chemical Bank*, 418 F. Supp. 690, 692 (E.D.N.Y. 1976).

[56]*Id.* at 200.

that whatever the debtor would owe upon liquidation, including its withdrawal liability, must be included in assessing the debtor's solvency for avoidance purposes.

Or, to put it differently, the court in *Martin* would have undoubtedly included the two guaranties in its liquidation analysis regardless of their contingent nature had the likelihood of them being paid from another source been less. And, for the same reason, Debtor's withdrawal liability should be included in determining insolvency here. After all, no other source has been identified to cover it. Therefore, this debt would have inevitably been among those liabilities still remaining to be paid were Debtor to have closed immediately after any of the challenged transfers were made.

Defendants and *Xonics* both caution that the inclusion of withdrawal liability and other contingent debt "unbalances," if you will, a debtor's financial statements. However, accounting principles should not dictate whether a debtor is insolvent or not under MUFTA or, for that matter, Section 548. Granted, GAAP does provide a framework within which to make the asset/debt comparison that the fraudulent transfer laws require. However, including a particular contingent liability or not in the fraudulent transfer equation is to be decided by a court, not an auditor.[57] And in making that determination, it is appropriate for the court to consider what additional debts would arise if the debtor were then liquidated, including any withdrawal liability regarding a multiemployer plan.

## CONCLUSION

In sum, then, *CPT Holdings* without question precludes Trustee from including Debtor's estimated withdrawal liability in the determination of whether it was insolvent or not under Section 548. However, this court is satisfied that *CPT Holdings* should be confined to only constructive

---

[57]*Cf. Xonics*, 841 F.2d at 199-200; *Martin*, 145 B.R. at 948-49.

fraud actions brought under that section. Consequently, Trustee is still able to include Debtor's estimated withdrawal liability in his separate Section 544(b)/MUFTA claim against Defendants. Put simply, what constitutes a claim under MUFTA is not dictated by how *CPT Holdings* has interpreted that same term under the Bankruptcy Code, especially, when the issue in *CPT Holdings* had nothing to do with the avoidance of fraudulent transfers. It is instead the policy of ensuring a fair distribution of assets that underlies Michigan's own fraudulent transfer laws and it is for that reason that a debtor's withdrawal liability must be factored into the insolvency equation whenever avoidance under Section 544(b) is sought.

Therefore, Trustee's motion is denied with respect to his constructive fraud claim under Section 548(a)(1)(B)(ii)(I) but is granted with respect to his constructive fraud claim under Section 544(b). The court will enter a separate order consistent with this opinion.

Dated: JUN 1 0 2013
at Grand Rapids, Michigan

6/10/13

Honorable Jeffrey R. Hughes
United States Bankruptcy Judge

22